**NORTH OLMSTED CHAMBER OF COMMERCE, et al., Plaintiffs,**

v.

**CITY OF NORTH OLMSTED, Defendant.**

**No. 1:98CV0810.**

United States District Court, N.D. Ohio, Eastern Division.

Jan. 21, 2000.

Barry M. Byron, Law Offices of Barry M. Byron, Willoughby, OH, for amicus.

Thomas Andrew Cunniff, Robert J. Fogarty, Rob M. Kochis, Hahn, Loeser & Parks, Cleveland, OH, for plaintiffs.

George Hudson Carr, Office of the Law Director, James M. Dubelko, Careau & Dubelko, Michael R. Gareau, Office of the Law Director, North Olmsted, OH, for defendant.

## MEMORANDUM OPINION AND ORDER

NUGENT, District Judge.

This matter comes before the Court upon Magistrate Judge Patricia A. Hemann's Report and Recommendation (Document # 40) issued August 17, 1999. The Magistrate Judge recommended Plaintiffs' Cross–Motion for Partial Summary Judgment be granted in part and overruled in part and Defendant's Motion for Summary Judgment be granted in part and overruled in part. For reasons that follow, the Court finds that Defendant's sign ordinance is unlawfully content based; contains an illegal prior restraint; and, violates equal protection of the laws. Thus, Defendant is enjoined from enforcing

CHAPTER 1163 OF THE CODIFIED ORDINANCES OF NORTH OLMSTED.

### Factual and Procedural History

Plaintiffs—North Olmsted Chamber of Commerce, a nonprofit association of over 200 North Olmsted businesses; Great Northern Dodge; Sunnyside Cars; and, Richard Moran, an individual resident of North Olmsted—filed this civil action against Defendant, the City of North Olmsted, asserting that the City's sign ordinance unconstitutionally restricts their freedom of expression and other protected rights. Plaintiffs bring this action pursuant to 42 U.S.C. § 1983, the United States Constitution, the Ohio Constitution, and Ohio law, seeking a declaratory judgment pursuant to 28 U.S.C. § 2201 and injunctive relief.

Specifically, Plaintiffs raise nine counts against Defendant: (1) the sign ordinance violates the First Amendment because it discriminates between categories of speech and identity of the speaker, acts as an illegal prior restraint on speech, operates as a total ban on certain types of speech, and because Defendant has illegally retaliated against Plaintiffs for exercising their First Amendment rights; (2) the sign ordinance is void for vagueness, depriving Plaintiffs of due process of law in violation of the First, Fifth, and Fourteenth Amendments; (3) the sign ordinance is unconstitutionally overbroad in violation of the First Amendment; (4) the sign ordinance unreasonably discriminates between similarly situated Plaintiffs based solely on the content of the messages expressed, in violation of the Fourteenth Amendment's Equal Protection Clause; (5) the sign ordinance violates their freedom of speech, press, and expression in contravention of Article I, §§ 11 and 19, of the Ohio Constitution; (6) the sign ordinance is an unconstitutional zoning ordinance under the Ohio and United States Constitutions because it is arbitrary and unreasonable in violation of substantive due process rights; (7) the sign ordinance denies Plaintiffs of the economically viable use of their property and thus is an unconstitutional taking under the Fifth and Fourteenth Amendments of the United States Constitution, and Article I, § 16, of the Ohio Constitution; (8) Defendant's attempts to restrict the continuing use of Plaintiffs' signs which existed prior to the passage of the sign ordinance constitute violations of OHIO REV.CODE § 713.15; and, (9) the sign ordinance violates the Fourteenth Amendment's Due Process Clause, as well as Article I, § 16, of the Ohio Constitution, by authorizing the City to deprive Plaintiffs of liberty and property interests without a hearing and other due process.

Plaintiffs assert that, as a result of the sign ordinance, some or all of the Plaintiffs have suffered, and all of the Plaintiffs will suffer, irreparable injury. The City adopted the comprehensive sign ordinance in May of 1991. The sign ordinance is some 23 pages in length, governing all types of signs—commercial and noncommercial. *See* CODIFIED ORDINANCES OF NORTH OLMSTED, OHIO, CHAPTER 1163 (hereafter "Ord."). Property owners who had existing nonconforming signs were not required to remove them until January 1, 1998. Ord. § 1163.29. Additionally, sign owners who could demonstrate hardship in not meeting this six and one-half year repose were given an additional 90 days to comply. *Id.*

The sign ordinance states that all signs "shall be designed, erected, altered, reconstructed, moved and maintained, in whole or in part, in accordance with the type, design, size, location, illumination and other provisions set forth in this chapter." Ord. § 1163.02. A "sign" is defined as:

any display, figure, painting, drawing, placard, poster or other device visible from a public way which is designed, intended or used to convey a message, advertise, inform or direct attention to a building, person, institution, organization, activity, place, object or product. It may be a structure or part thereof

painted on or attached directly or indirectly on a structure.

Ord. § 1163.03.

After January 1, 1998, Defendant began sending out notices of violations to those property owners who had not conformed to the ordinance. The sign ordinance provides that the building official may remove the nonconforming sign at the owner's expense and that the owner or person in possession of the sign shall be individually and separately liable for the expense incurred in the removal or maintenance of such sign. Ord. § 1163.25.

In May of 1998, Ms. Edith Smith of Sign–Lite Corporation filed a permit application on behalf of Plaintiff Great Northern Dodge in order to reface its ground sign. The application requested a permit to reface the ground sign to include the words "Five Star" and a logo with five stars. Chrysler had recently re-certified Great Northern as a "Five Star Dealer," an award given to dealers based on customer satisfaction, training, employee quality, and facility quality. As a Five Star Dealer, Great Northern was required to include the words "Five Star" and a logo with five stars on its sign. For its part, Chrysler made a commitment to emphasize the Five Star Program in its advertisements. Mr. Patrick Graham, general manager of Great Northern, stated that it is important for potential customers to know that Great Northern is a Five Star Dealer because that status provides an assurance of quality.

The City approved the permit so long as the words "Five Star" and the five star logo were omitted. Ms. Smith and Mr. Graham were told by the City's building department that the words "Five Star" and the five star logo were superfluous and unnecessary and that Great Northern did not need them as it was "not in the business of selling stars."

On or about November 24, 1998, Isabella's Café—a member of the Chamber of Commerce—received a notice of violation from the City's building department. The notice stated that Isabella's Café's "temporary banner sign" violated the ordinance and ordered removal of the sign within 48 hours. Dominic Mihalic, co-owner of Isabella's Café, spoke to Dennis O'Connell of the City's building department, who agreed that the sign could remain in place until December 2, 1998. However, on December 2, 1998, before Mr. Mihalic removed the sign and without consulting anyone at Isabella's Café, the City removed the sign from the outside of the building. When Mr. Mihalic requested return of the sign he was told he had to pay the City $203.03 for reimbursement for removal of the sign. Mr. Mihalic was told that if he did not pay the bill, his sign would be thrown away. Mr. Mihalic did not pay the bill and the City has not returned the sign. Mr. Mihalic further relates that while he was required to remove his banner sign, the United States Post Office was permitted to keep a banner sign up for several months advertising its new hours.

Plaintiffs filed a Complaint with the Court on April 7, 1998, and a First Amended Complaint on July 24, 1998. Defendant filed Answers on April 27, 1998, and August 3, 1998. Thereafter, on January 29, 1999, Defendant filed a Motion for Summary Judgment on all nine counts. Plaintiffs filed, on March 12, 1999, an Opposition to Defendant's Summary Judgment Motion and a Cross–Motion for Partial Summary Judgment on counts one (except the retaliatory enforcement claim), two, three, four, six, and nine. Defendant filed its Reply on April 9, 1999. Plaintiffs filed their Reply on April 23, 1999.

The Court referred this matter to Magistrate Judge Hemann on May 10, 1999, in order for the Magistrate Judge to hold a settlement conference and prepare a report and recommendation on the pending motions. The Magistrate Judge held a settlement conference on June 16, 1999, to no avail. On August 17, 1999, the Magistrate Judge submitted her well-reasoned and thorough Report and Recommendation, in which she recommended that this

Court grant Plaintiffs' Motion in part and deny it in part, and grant Defendant's Motion in part and deny it in part.

Defendant filed Objections, and Plaintiffs filed Conditional Objections, to the Magistrate Judge's Report and Recommendation on October 1, 1999. The Ohio Municipal League, as *amicus curiae*, filed a brief in support of Defendant on October 1, 1999. Plaintiffs' filed their Response to Defendant's Objections on October 19, 1999.

### Standard of Review for a Magistrate Judge's Report and Recommendation

■ The applicable district court standard of review for a magistrate judge's report and recommendation depends upon whether objections were made to that report. When objections are made to a report and recommendation of a magistrate judge, the district court reviews *de novo* those portions of the report and recommendation to which specific objection has been made. FED.R.CIV.P. 72(b) provides this standard of review. It states, in pertinent part:

> The district judge to whom the case is assigned shall make a de novo determination upon the record, or after additional evidence, of any portion of the magistrate judge's disposition to which specific written objection has been made in accordance with this rule. The district judge may accept, reject, or modify the recommended decision, receive further evidence, or recommit the matter to the magistrate judge with instructions.

Because the parties filed timely objections to the Magistrate Judge's Report and Recommendation, this Court reviews *de novo* those portions to which objection has been made.

### Summary Judgment Standard

■ Summary judgment is appropriate when the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R.CIV.P. 56(c).

[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions; answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citing FED.R.CIV.P. 56(c)). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

■ Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of their case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir.1995) (citing *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548). In most civil cases involving summary judgment, the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. The judge's sole function is to determine whether there is a genuine factual issue for trial, which does not exist unless "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. 2505. In sum, proper summary judgment analysis entails "the threshold inquiry of determining whether there is the need for a trial— whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505.

### Discussion

#### I. Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal law claims) and 28 U.S.C. § 1367 (state law claims).

## II. Plaintiffs' First Amendment Challenge[1]

 The Free Speech Clause of the First Amendment states that "Congress shall make no law ... abridging the freedom of speech...." U.S. CONST. amend. I. The First Amendment is applicable to the political subdivisions of the states under the Due Process Clause of the Fourteenth Amendment. *See 44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 489 n. 1, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996); *Lovell v. Griffin,* 303 U.S. 444, 450, 58 S.Ct. 666, 82 L.Ed. 949 (1938).

Plaintiffs argue that the City's sign ordinance violates the First Amendment. Magistrate Judge Hemann determined that the sign ordinance is an impermissible prior restraint on speech; an impermissible content-based restriction of commercial speech and noncommercial speech; and, is substantially overbroad. The Magistrate Judge also determined that the City's selective prohibition of pole signs made impermissible content-based distinctions and that—because the unlawful sections are integral to the ordinance and cannot be severed—the ordinance should be invalidated in its entirety. On each conclusion, Defendant objects.

### A. Standing

 "To bring a cause of action in federal court requires that plaintiffs establish at an irreducible minimum an injury in fact; that is, there must be some threatened or actual injury resulting from the putatively illegal action[.]" *Virginia v. American Booksellers Assoc.,* 484 U.S. 383, 392, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988) (internal quotes and citations omitted). Plaintiffs, as a result of the sign ordinance, have been denied the opportunity to express their message, have been cited with a violation for expressing a message, will have to take significant and costly compliance measures to avoid prosecution, and may refrain from engaging in protected activity, all of which may be redressed by a favorable decision of this Court. *See id.; see also Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

Where an injury, actual or imminent, is demonstrated, the usual rule is that a party may assert only a violation of its own rights. *American Booksellers,* 484 U.S. at 392, 108 S.Ct. 636. However, in the First Amendment context, a plaintiff may challenge a law on its face because it is content based, *see R.A.V. v. City of St. Paul,* 505 U.S. 377, 381, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992), or because it might chill the First Amendment rights not only of the plaintiff, but of others not before the court. *See American Booksellers,* 484 U.S. at 392–93, 108 S.Ct. 636 (citing *Secretary of State of Maryland v. Munson Co.,* 467 U.S. 947, 956–57, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984)).[2]

---

1. Plaintiffs' claim of a free speech violation under Ohio's Constitution is incorporated into the following discussion because the "First Amendment is the proper basis for interpretation of Section 11, Article 1, [of the] Ohio Constitution[.]" *City of Cleveland v. Trzebuckowski,* 85 Ohio St.3d 524, 709 N.E.2d 1148, 1152 (1999).

2. These two doctrines are merely species of a genus that permit facial challenges to laws that impinge on the First Amendment. Facial challenges to laws have been entertained on grounds that the laws: chill third party expression, *American Booksellers,* 484 U.S. 383, 108 S.Ct. 636; contain content-based restrictions, *R.A.V.,* 505 U.S. 377, 112 S.Ct. 2538; *Reno v. American Civil Liberties Union,* 521 U.S. 844, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997); contain viewpoint-based restrictions, *National Endowment for the Arts v. Finley,* 524 U.S. 569, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998); restrict others' expression even if not restricting the plaintiff's (traditional "overbreadth"), *Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984); contain vague terms (vagueness), *Kolender v. Lawson,* 461 U.S. 352, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983); contain an impermissible prior restraint on speech because the ordinance delegates overly broad discretion to the decision maker, *City of Lakewood v. Plain Dealer Publ'g Co.,* 486 U.S. 750, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988); and, contain a system of prior re-

Under the latter doctrine, a plaintiff is permitted to facially challenge a statute not only because his own rights of free expression are violated, "but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *American Booksellers*, 484 U.S. at 392–93, 108 S.Ct. 636 (quotes and citation omitted). "[W]hen there is a possibility that, rather than risk punishment for his conduct in challenging the statute, [an individual] will refrain from engaging further in the protected activity, courts have been willing to relax prudential standing limitations and permit a third party to assert the rights of a person not otherwise before the court." *Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Michigan Gaming Control Bd.*, 172 F.3d 397, 407 (6th Cir. 1999) (quotes and citation omitted). Because the City's sign ordinance extensively regulates all types of signs, commercial and noncommercial, others may refrain from engaging in constitutionally protected activities.

Under the former doctrine, plaintiffs are permitted to challenge an ordinance on its face where the ordinance "prohibits otherwise permitted speech solely on the basis of the subjects the speech addresses." *R.A.V.*, 505 U.S. at 381, 112 S.Ct. 2538. In *R.A.V.*, the Court found it unnecessary to consider petitioner's "overbreadth" challenge. Rather, the Court held petitioner could facially challenge the ordinance because it was content based. Thus, a facial challenge is appropriate where a plaintiff claims "that the ordinance was 'overbroad' in the sense of restricting more speech than the Constitution permits, even in its application to [the plaintiff only], because it is content based." *Id.* at 381 n. 3, 112 S.Ct. 2538.[3] In the matter at hand, Plaintiffs may challenge the sign ordinance on its face because it "restricts more speech than the Constitution permits . . . because it is content based." *Id.*

Further, Plaintiffs have proper standing to facially challenge the ordinance on the ground that it improperly delegates licensing discretion to an administrative office. "[A] licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988) (citations omitted). Thus, "it is well established that one has standing to challenge a statute on the ground that it delegates overly broad licensing discretion to an administrative office, whether or not his conduct could be proscribed by a properly drawn statute, and whether or not he applied for a li-

straint that creates a risk of delay and lacks the necessary procedural safeguards, *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990); *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). Of course, facial challenges have been permitted in other appropriate non-First Amendment contexts. *See Los Angeles Police Dep't v. United Reporting Publ'g Corp.*, —— U.S. ——, ——, 120 S.Ct. 483, 488, 145 L.Ed.2d 451 (1999). While a party whose own activities are unprotected but who challenges an ordinance on behalf of others (traditional overbreadth) may not be permitted to do so in cases involving "commercial speech," *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 504 n. 11, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981), those with a "commercial interest" *may* challenge the facial validity of a statute on the grounds that it infringes on the First Amendment interests of others. *Id.* However, this Court need not consider Plaintiffs' First Amendment claims of overbreadth or vagueness, which are doctrines of last resort. As articulated below, the sign ordinance is an impermissibly content-based restriction on commercial and noncommercial speech, and therefore may be facially challenged under the Supreme Court's reasoning in *R.A.V.* Further, the licensing scheme contained in the ordinance may be facially challenged as an impermissible prior restraint on protected activity.

**3.** *See also Secretary of State of Maryland v. Munson*, 467 U.S. at 959, 104 S.Ct. 2839 ("The requirement that a statute be 'substantially overbroad' before it will be struck down on its face is a 'standing' question only to the extent that if the plaintiff does not prevail on the merits of its facial challenge . . . it has no 'standing' to allege that, as applied to others, the statute might be unconstitutional").

cense." *Freedman v. Maryland*, 380 U.S. 51, 56, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965); *see also City of Lakewood*, 486 U.S. at 764, 108 S.Ct. 2138.[4]

## B. Content Neutrality

On a First Amendment challenge regarding the regulation of speech, the "normal inquiry our doctrine dictates is, first, to determine whether a regulation is content based or content neutral, and then, based on the answer to that question, to apply the proper level of scrutiny." *City of Ladue v. Gilleo*, 512 U.S. 43, 58, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994) (O'Connor, J., concurring) (citations omitted). *See also Richland Bookmart, Inc. v. Nichols*, 137 F.3d 435, 440 (6th Cir.1998) ("The normal starting point for a discussion of the facial validity of statutory regulation of speech requires an analysis of the so-called 'content-neutrality' of the regulation."); *Cleveland Area Bd. of Realtors v. City of Euclid*, 88 F.3d 382, 386 (6th Cir.1996) (stating that under a "time, place, and manner" analysis, the first question to ask is whether the ordinance is content neutral).

■ A regulation of speech is content based when the content conveyed determines whether the speech is subject to restriction. *See City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993); *see also Turner Broadcasting Sys. v. FCC*, 512 U.S. 622, 643, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) ("As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based.").

■ The Supreme Court has held that, under certain circumstances, "the government may impose reasonable restrictions on the time, place, or manner of engaging in protected speech provided that they are adequately justified ' "without reference to the content of the regulated speech." ' " *Discovery Network*, 507 U.S. at 428, 113 S.Ct. 1505 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) and *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984)).

Magistrate Judge Hemann determined that the City's sign ordinance contains content-based restrictions on protected noncommercial speech as well as on commercial speech. She applied strict scrutiny to the City's content-based regulation of noncommercial speech and intermediate scrutiny to the City's content-based regulation of commercial speech. The Court evalu-

---

4. While several courts of appeals have considered prior restraint claims brought by commercial speakers, *see Nutritional Health Alliance v. Shalala*, 144 F.3d 220, 227–28 (2d Cir.1998), *cert. denied*, 525 U.S. 1040, 119 S.Ct. 589, 142 L.Ed.2d 532 (1998); *New York Magazine v. Metropolitan Trans. Auth.*, 136 F.3d 123, 131 (2d Cir.1998); *Desert Outdoor Advertising, Inc. v. City of Moreno Valley*, 103 F.3d 814, 818–19 (9th Cir.1996), *cert. denied*, 522 U.S. 912, 118 S.Ct. 294, 139 L.Ed.2d 227 (1997); *Kirkpatrick v. Shaw*, 70 F.3d 100, 104 (11th Cir.1995); *Outdoor Sys., Inc. v. City of Mesa*, 997 F.2d 604, 613 (9th Cir.1993); *Kitty's East v. United States*, 905 F.2d 1367, 1371 (10th Cir.1990); *FTC v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35, 43–44 (C.A.D.C. 1985), neither the Supreme Court nor the Sixth Circuit—this Court's polestars—has so decided. Justice Blackmun, in *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 n. 24, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), noted that those attributes of commercial speech that make it "different" than fully protected noncommercial speech "may also make inapplicable the prohibition of prior restraints." While this comment would seem to be incongruous with the "tougher standard" that is used today for commercial speech, *see Greater New Orleans Broadcasting Assoc., Inc. v. United States*, 527 U.S. 173, 119 S.Ct. 1923, 1929, 144 L.Ed.2d 161 (1999)—particularly considering that lower-value sexually explicit but not obscene speech receives the full protection of the prior restraint doctrine, *see generally FW/PBS*, 493 U.S. 215, 110 S.Ct. 596—the Court need not decide the issue today because, at the very least, Plaintiff Moran and those parties who, apart from being commercial speakers, have a "commercial interest" at stake, *Metromedia*, 453 U.S. at 504 n. 11, 101 S.Ct. 2882, have standing to assert this claim.

ates each of these categories of speech in turn.

### 1. Content-based restrictions on protected noncommercial speech

 As the Magistrate Judge pointed out, the City's sign ordinance contains "pervasive" content-based restrictions on fully protected noncommercial speech. Content-based restrictions on protected noncommercial speech receive strict scrutiny, *i.e.*, the government must "show that the 'regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.'" *Boos v. Barry*, 485 U.S. 312, 321–22, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988) (citations omitted); *see also Turner*, 512 U.S. at 680, 114 S.Ct. 2445 (O'Connor, J., concurring and dissenting). In order to pass strict scrutiny, the regulation at issue must be narrowly drawn by the least restrictive means. *Boos*, 485 U.S. at 329, 108 S.Ct. 1157; *Ward*, 491 U.S. at 798 n. 6, 109 S.Ct. 2746.

> The City argues that:
>
> Rather than apply the Magistrate Judge's simplistic test in which [noncommercial speech] regulations fail if they consider content, this Court should apply the proper test, in which regulations that consider content are nonetheless presumed constitutional unless they *intend* to suppress speech. As the City's regulatory scheme does not prevent any message from ever being expressed, but simply limits the size, shape, and location of signs bearing certain content, it

should properly be considered "content-neutral" for constitutional purposes. (Def.'s Objections at 13.)[5]

An argument similar to the City's was considered and rejected by the Supreme Court in *Discovery Network*. In that case, the city of Cincinnati refused to allow respondents to distribute their commercial publications through freestanding commercial newsracks located on public property. The city argued that its regulation of newsracks qualified as a content-neutral restriction "because the interests in safety and esthetics that it serves are entirely unrelated to the content of respondent's publications. Thus, the argument goes, the justification for the regulation is content neutral." *Discovery Network*, 507 U.S. at 429, 113 S.Ct. 1505. The Court responded that the city's argument was "unpersuasive" because "whether any particular newsrack falls within the ban is determined by the content of the publication resting inside the newsrack. Thus, by any commonsense understanding of the term, the ban in this case is 'content based.'" *Id.* Citing *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 117, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991), the Court stated that it had "expressly rejected the argument that 'discriminatory · . . . treatment is suspect under the First Amendment only when the legislature intends to suppress certain ideas.'"

The *Simon & Schuster* Court responded to the argument that the legislature's in-

---

**5.** Defendant and its *amicus* cite *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), for the proposition that when a municipality justifies the purpose of an ordinance as targeting "secondary effects," the ordinance is thereby rendered content neutral. This is not the law. The Supreme Court has held that when the government aims at regulating the secondary effects of sexually explicit but not obscene speech "without reference to the content of the regulated speech", the regulation is considered "content neutral" and is examined via the intermediate scrutiny test. *Id.* at 48–49, 106 S.Ct. 925. *See also Richland Bookmart*, 137 F.3d at 440 (recognizing that,

in regard to adult theaters and bookstores, "a kind of legal fiction has been created that calls regulation of such literature [and theaters] 'content neutral' when what is meant is only that the regulation is constitutionally valid."). However, when an ordinance refers to the content of speech, regardless of legislative intent, content-based regulations of fully protected speech receive strict scrutiny and content-based regulations of truthful, nonmisleading commercial speech receive the *44 Liquormart*-fortified *Central Hudson* intermediate scrutiny test. Of course, the government's interest is given its due weight under these analyses.

tent should determine whether the regulation is content neutral: "This assertion is incorrect; our cases have consistently held that '[i]llicit legislative intent is not the sine qua non of a violation of the First Amendment.' ... 'We have long recognized that even regulations aimed at proper governmental concerns can restrict unduly the exercise of rights protected by the First Amendment.'" *Simon & Schuster,* 502 U.S. at 117, 112 S.Ct. 501 (citations omitted).

■ The sign ordinance at issue regulates signs based on their content. Based on well-settled Supreme Court precedent, this Court finds unpersuasive the City's argument that its admittedly content-based ordinance should be presumed content neutral because it does not *intend* to suppress speech. The question in determining whether a regulation is content based is not whether the regulation or the legislature intends to suppress speech, but rather it is, simply, whether the regulation restricts speech based on content.

The sign ordinance classifies signs by their use types—a content-based classification—and by structural types—a content-neutral classification. Ord. § 1163.03. The classification by use types section describes eight types of signs:

(a) *Classification by Use Types*

(1) "Permanent sign" means a sign designed for use for an indefinite period of time and shall include the following:

A. "Bulletin board" means an announcement sign which directs attention to and is located on the lot of a public or semi-public institution.

B. "Directional sign" means a sign indicating only the direction of pedestrian and vehicular circulation routes on the lot on which the sign is located. No advertising shall be permitted on directional signs.

C. "Identification sign" means a sign indicating the name and address of a building, development, public or semi-public facility, business, office or industrial establishment. For business uses, such sign may also include the principal type of goods sold or services rendered; however, the listing of numerous goods or services, prices, sale items, and telephone numbers shall not be permitted.

D. "Informational sign" means a sign which present [sic] miscellaneous information to the public rather than to promote a business, office, industry, product, or issue. (Typical information signs present scheduled events, travel information, vehicle service, weather, time, historic and scenic data.) Informational signs shall be allowed only for public and semi-public uses as an integral part of a permitted identification sign.

E. "Organizational sign" means a sign devoted exclusively to the identification of national, state and local service clubs. The number, location and design of organizational signs shall be approved by the Building Official.

F. "Nameplate" means a sign indicating the name, address or profession of the person or persons occupying a building, or unit of a building.

(2) "Temporary sign" means a sign designed for use for a limited period of time to announce special events or sales and the sale, lease or rental of property and shall include the following. The expiration date of a temporary sign as approved by the Building Official shall appear on each temporary sign.

A. "Project sign" means a sign which directs attention to the promotion, development and construction of the property on which it is located and which identifies the owner, architects, engineers, contractors and other individuals or firms involved with the construction.

B. "Real estate sign" means a sign advertising the sale, rental, or lease of the premises or part of the premises on which the sign is displayed.

Ord. § 1163.03(a). Separate subsections of the sign ordinance describe murals, § 1163.231, and political signs, § 1163.27. All of these signs are categorized, defined, and/or limited by their content.

The Magistrate Judge correctly determined that the classifications by use types implicate noncommercial speech. The following sections of the sign ordinance contain content-based restrictions on noncommercial speech and must be given strict scrutiny.

"Directional signs" are limited to content "indicating only the direction of pedestrian and vehicular circulation routes on the lot on which the sign is located." Ord. § 1163.03(a)(1)B. Thus, a sign in the shape of an arrow on a front lawn stating "Betsy's Party" or "Vote Here" is in violation of the ordinance. "Identification signs" indicate the name and address of a building. Ord. § 1163.03(a)(1)C. Telephone numbers are not permitted on identification signs. *Id.* "Informational signs" present "miscellaneous information to the public rather than to promote a business, office, industry, product or issue. (Typical information signs present scheduled events, travel information, vehicle service, weather, time, historic and scenic data.)" Ord. § 1163.03(a)(1)D. Informational signs for private uses are not permitted, while public or semi-public uses are permitted only as an "integral part of a permitted identification sign." *Id.* Thus, a square sign on a front lawn announcing a "scheduled event," *e.g.,* "Betsy's Party" or "Vote Here Today," is also in violation of the ordinance because it is not part of an identification sign. An "organizational sign" may include only the identification,

number, location, and meeting dates of only national, state, and local service clubs. Ord. § 1163.03(a)(1)E. A "nameplate" may only contain the name, address, or profession of the person occupying the building to which the nameplate is attached. Ord. § 1163.03(a)(1)F.

Section 1163.07 of the ordinance regulates "residential district signs." [6] The content of a sign determines in whole or in part the maximum area allowable of that sign, where the sign must be located, the number of signs permitted, and whether the sign may be illuminated. A "nameplate" indicating an occupant's name and house number must not exceed two square feet in area and is to be located on a wall or panel. Only one nameplate is permitted. A "temporary real estate ground sign" advertising the sale, rental, or lease of the premises must not exceed six square feet. This sign must be at least 25 feet from any side lot line or 10 feet from any street right-of-way line. Only one real estate sign is permitted; illumination is not allowed. A "temporary project" sign must not exceed twenty-five square feet. Only one allowed. Further, the project sign shall not be located less than 25 feet from the nearest street right-of-way and lot line and 100 feet from the nearest occupied residence.

Section 1163.04 of the ordinance regulates "design standards" and contains several content-based restrictions. Any sign "visible from the sight lines along a street shall not contain an arrow or words such as 'stop', 'go', 'slow', etc.; and the movement, content, coloring or manner of illumination shall not resemble traffic control signs." Ord. § 1163.04(f). Thus, a political sign mimicking a stop sign and announcing "Stop Gun Violence" would not be allowed under this ordinance. Signs

---

**6.** Content-based regulations of "residential district signs" receive strict scrutiny. While the Court recognizes that some of these "residential district" signs may deal with or propose an economic transaction, *e.g.,* real estate signs, these signs are intertwined with fully protected speech to such a degree that evaluating them as pure commercial speech would be inappropriate. *See Cleveland Area Bd. of Realtors,* 88 F.3d at 386 (concluding that where comprehensive sign ordinance regulates all types of residential signs, commercial speech test is unhelpful and inappropriate).

that contain movement (which revolve, rotate, swirl, flash, or otherwise make use of motion to attract attention) may only contain the time, temperature, or some other "public service" function. Ord. § 1163.04(g). The color content of all signs must be compatible with the color of the building facade and other existing and proposed signs. Ord. § 1163.04(j). All sign lettering must be "clearly legible and in scale with the sign surface upon which it is placed." Ord. § 1163.04(k). Only "informational signs"—which present miscellaneous information to the public—are allowed to have copy that is changeable. *Id.* Only nameplates, identification signs, and bulletin boards may be illuminated for residential purposes. Ord. § 1163.05.

Painted wall murals located in commercial districts may not include words, corporate products or images, must not be internally illuminated or exceed 75 square feet in area, and must have content that is compatible with the approved color scheme upon which it is located.[7] Ord. § 1163.231. Section 1163.27 regulates "political signs." Temporary displays or signs in connection with a charity drive or to advocate the election of a candidate or candidates or the passage or disapproval of an issue are exempt from the ordinance only if they are removed within 10 days of the completion of the drive or election involved. Ord. § 1163.27.

These content-based restrictions on noncommercial speech receive strict scrutiny. The City must show that the regulation is necessary to serve a compelling interest and that it is narrowly drawn—by the least restrictive means—to achieve that end. *See Boos*, 485 U.S. at 321–22, 329, 108 S.Ct. 1157. The City's interests in regulating signs are (1) safety, *i.e.*, to "eliminate any conflict between advertising signs and traffic control signs which would be hazardous to the safety of the motoring public or pedestrian" and, (2) aesthetics, *i.e.*, to "control the design and size of all signs so that their appearance will be aesthetically harmonious with an overall urban design for the area". Ord. § 1163.01(c), (d).[8]

While the Supreme Court has determined that "safety" and "aesthetics" are "substantial" interests, *see Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 507–08, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981), the Court has never determined that these interests are compelling enough to justify content-based restrictions on fully protected speech. In fact, the Court has stated that, in regard to noncommercial speech, a city is limited in its choice "to evaluate the strength of, or distinguish between, various communicative interests." *Id.* at 514–15, 101 S.Ct. 2882 (citations omitted). "With respect to noncommercial speech, the city may not choose the appropriate subjects for public discourse[.]" *Id.* at 515, 101 S.Ct. 2882.

At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence. Our political system and cultural life rest upon this ideal.... Government action that stifles speech on account of its message, or that requires the utterance of a particular message favored by the Government, contravenes this essential right. Laws of this sort pose the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information or manipulate the public debate through coercion rather than persuasion.

---

7. Murals are included as fully protected speech. Although the ordinance regulates only those murals that are in commercial districts, the murals may not contain a corporate service, product, or image, which forecloses a substantial part of commercial speech. If the City allows noncommercial murals on walls of commercial establish-ments, its restrictions must either be content neutral or, if content based, pass strict scrutiny.

8. *See* Def.'s Mot. for Summ. J. at 3, 18. The City's other interests, § 1163.01(a), (b), and (e), reinforce the goals of safety and aesthetics.

These restrictions 'rais[e] the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace.'

Turner, 512 U.S. at 641, 114 S.Ct. 2445 (citations omitted).

Even if the City's interests in safety and aesthetics could be considered "compelling," the sign ordinance fails because it is not narrowly tailored. Magistrate Judge Hemann correctly determined that the sign ordinance's content-based restrictions on noncommercial speech are not narrowly tailored to achieve the City's goals of traffic safety and aesthetics. This lack of narrow tailoring, along with the myriad exceptions the City provides to favored speakers, significantly undercuts the City's rationales of safety and aesthetics. As the discussion below indicates, it is not clear why many of the City's distinctions are any safer or more aesthetically pleasing than the proscribed alternatives.

"Directional signs" may contain the words "Exit Here," but not the words "Vote Here" despite having the same number of letters and an ostensibly similar aesthetic sensibility. Ord. § 1163.03(a)(1)B. An "identification sign" may contain a verbose name and address of a building but not a sparse name and address with a telephone number. Ord. § 1163.03(a)(1)C. "Informational signs" are not permitted for private use, but are permitted for "public or semi-public" use, despite the number of these signs in a given area and despite that, as part of an identification sign, they may be up to 50 square feet in face area. Ord. §§ 1163.03(a)(1)D, 1163.08. An "organizational sign" or a "nameplate" may contain names, addresses, and, respectively, meeting dates or avowed profession in great verbiage, but they may not contain a logo, quote, salutation, or other information. While a nameplate indicating the resident's name and house number may not exceed two square feet, a temporary real estate sign or project sign located directly adjacent to it may be six square feet or 25 square feet in area

respectively. Ord. § 1163.07(a), (b), (c). Residential nameplates, identification signs, and bulletin boards may be illuminated, but signs indicating direction, an organization, or a political message may not. Ord. § 1163.05. A sign containing a "public service" message may employ parts that revolve, rotate, whirl, spin, flash, or move; all other signs may not. Ord. § 1163.04(g).

Any sign "visible from sight lines along a street shall not contain an arrow or words such as 'stop'. 'go', 'slow', etc." Ord. § 1163.04(f). Thus, while a political sign in one's front yard or window reading "Stop Proposition A" before an election is permitted, a political sign reading "Stop War" or a sign reading "Go Browns" at any time is not. Ord. §§ 1163.04(f), 1163.27. Further, while a sign in connection with a charity drive or to advocate the election of a candidate or the passage or disapproval of an issue is exempt if removed within 10 days after the election, political signs with other content are not exempt. Ord. § 1163.27.

It is unclear why an "informational sign" may have changeable copy, but a sign presenting an "issue" to the public—say, counting the number of days an unconstitutional ordinance has been on the books—may not. Ord. § 1163.04(k). The content of one type of sign is certainly not "safer" or inherently more "aesthetically pleasing" than the other. It is also not evident why a mural may contain content that may be very distracting (such as sexually explicit but not obscene art) or aesthetically displeasing, but may not contain words, corporate products, or corporate images. Surely a mural containing the "golden arches" of McDonalds is not more distracting than Botticelli's "Venus" or more aesthetically displeasing than some modern works of art that may be reproduced on the side of a wall.

Further, the City's exemptions for favored speakers undercuts its rationales of safety and aesthetics. Official public notices, despite their number, size, or aesthetic beauty are exempt, as are the flags,

emblems, and insignia of all governmental bodies. Ord. § 1163.03. Holiday decorations, despite their size, aesthetic sensibility, and use of flashing or moving parts, are exempt "for customary periods of time." Ord. § 1163.23(e). Signs in connection with a charity drive and those political signs advocating election of a candidate or passage or disapproval of an issue are exempt from the ordinance, while others are not. Ord. § 1163.27.

The City's sign ordinance contains a litany of content-based restrictions on protected noncommercial speech. Because the City has not shown that the content-based distinctions are necessary to serve their interests of safety and aesthetics, and because the ordinance is not narrowly drawn by the least restrictive means to achieve those interests, the City's content-based restrictions in its sign ordinance are unconstitutional.

### 2. Content-based restrictions on truthful, nonmisleading commercial speech

█ Regarding the commercial speech[9] portions of the ordinance, Magistrate Judge Hemann correctly determined that the ordinance includes restrictions that discriminate between commercial speakers according to content. Content-based restrictions on truthful, nonmisleading commercial speech receive intermediate scrutiny with bite under the four-part *Central Hudson* test, *i.e.*, the court must determine that (1) the expression is protected by the First Amendment; (2) the government interest is "substantial"; (3) the regulation directly advances the governmental interest asserted; and, (4) whether the regulation is not more exten-

sive than is necessary to serve that interest. *Greater New Orleans Broadcasting Assoc., Inc. v. United States*, 527 U.S. 173, 119 S.Ct. 1923, 1930, 144 L.Ed.2d 161 (1999) (quoting *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557, 566, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980)). *See also Greater New Orleans*, 119 S.Ct. at 1929 (noting that the Court's opinions in *44 Liquormart*, 517 U.S. at 509–10, 531–32, 116 S.Ct. 1495, "applied the Central Hudson test more strictly"). Under this analysis, the City bears the burden of identifying a substantial interest and justifying the challenged restriction. *Id.* 119 S.Ct. at 1930.

Neither party has objected to the Magistrate Judge's determination that the first prong of the *Central Hudson* test is not at issue. Plaintiffs stated in their Amended Complaint that they desire to engage "in the free exchange of truthful and valuable information about commercial and noncommercial subjects" and there has been no allegation that Plaintiffs' speech regarding commercial affairs would be unlawful or misleading. There was no objection to the Magistrate Judge's determination that the second prong is satisfied as well. The City's interest in safety and aesthetics may be accepted as "substantial."

█ The City objects to the Magistrate Judge's conclusions that a major part of the ordinance constitutes impermissible content-based restrictions on commercial speech because (1) they do not advance the City's interests and, (2) they are more extensive than necessary to serve those interests. Primarily, the City argues that the Magistrate Judge did not correctly apply the *Central Hudson* test, but em-

---

9. The line can be hard to draw when it comes to identifying what is or is not commercial speech. Indeed, the very definition of "commercial speech" is debatable. *See Rubin v. Coors Brewing Co.*, 514 U.S. 476, 491–98, 115 S.Ct. 1585, 131 L.Ed.2d 532 (1995) (Stevens, concurring) (noting that "economic motivation or impact alone" does not make speech lesser protected "commercial speech"); Alex Kozinski & Stuart Banner, *Who's Afraid of Commercial Speech?*, 76 Va.L.Rev. 627, 638–

48 (1990) (finding the commercial/noncommercial speech distinction to be "arbitrary" and having "no justification in the real world"). While it is debatable whether or not a store-front sign should be lesser-protected "commercial speech," the Supreme Court has generally categorized signs which identify a business and advertise a product or service as forms of commercial speech. *See Metromedia*, 453 U.S. at 512, 101 S.Ct. 2882.

ployed "the least restrictive means test." (Def.'s Objections at 10.) The City argues that it "has adopted regulations that are reasonable in light of its stated goals of protecting the aesthetics and traffic safety of the City, and [are] proportional to these ends." (Def.'s Objections at 11.) It is the City's contention that it is allowed to regulate commercial speech "with reasonable specificity" and that "all that is constitutionally required when regulating commercial speech" is that "the City's current regulations further the City's interests in some small way." (Def.'s Objections at 11.)

To the extent the City argues for a standard that is, in effect, rational basis review, the City is out of date and misses the mark. Far from rational basis review—where the government's ends must be "legitimate" and the means must be "rational"—the Supreme Court's recent cases have given extra bite to the intermediate scrutiny review of *Central Hudson*.[10] *See Greater New Orleans,* 119 S.Ct. at 1929–30; *Discovery Network,* 507 U.S. at 418 n. 13, 113 S.Ct. 1505.

The Supreme Court recently reiterated the elements of the third and fourth prongs of the *Central Hudson* test. The third prong asks whether the speech restriction directly and materially advances the asserted governmental interest.

"This burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." [Citation omitted.] Consequently, "the regulation may not be sustained if it

provides only ineffective or remote support for the government's purpose." [Citation omitted.] We have observed that "this requirement is critical; otherwise 'a State could with ease restrict commercial speech in the service of other objectives that could not themselves justify a burden on commercial expression.'" [Citations omitted.]

*Greater New Orleans,* 119 S.Ct. at 1932. *See also Amelkin v. McClure,* 168 F.3d 893, 898–99 (6th Cir.1999) (discussing the third prong of the *Central Hudson* test).

The Court stated that the fourth prong "complements the direct-advancement inquiry of the third, asking whether the speech restriction is not more extensive than necessary to serve the interests that support it." *Greater New Orleans,* 119 S.Ct. at 1932. While the City is correct that it is not required to employ the "least restrictive means" conceivable, the fit between means and ends must be "narrowly tailored" and the "regulation must indicate a 'carefu[l] calculat[ion of] the costs and benefits associated with the burden on speech imposed by its prohibition.'" *44 Liquormart,* 517 U.S. at 529, 116 S.Ct. 1495 (O'Connor, J., concurring) (quoting *Discovery Network,* 507 U.S. at 417, 113 S.Ct. 1505). In addition, "[t]he availability of less burdensome alternatives to reach the stated goal signals that the fit between the legislature's ends and the means chosen to accomplish those ends may be too imprecise to withstand First Amendment scrutiny." *Id.* (citations omitted).

Magistrate Judge Hemann concluded that at least four restrictions in the sign ordinance discriminate against commercial signs according to their content: Sections

---

**10.** In fact, in *44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996). Justices Stevens, Ginsburg, and Breyer would have applied strict scrutiny to content-based restrictions of truthful, nonmisleading commercial speech. Justice Thomas would go even further by applying "fatal" scrutiny, *i.e.,* finding such content-based distinctions *per se* illegitimate. All in all, six Justices have suggested dissolving the

category of commercial speech and assimilating it into general First Amendment doctrine where content-based distinctions receive strict scrutiny and content-neutral distinctions receive intermediate scrutiny; however, these Justices have not all sat on the Court at the same time. *See* Kathleen M. Sullivan, *Cheap Spirits, Cigarettes, and Free Speech: The Implications of 44 Liquormart,* 1996 Sup. Ct Rev. 123, 128, 141–42 (1997).

1163.03(a)(1)C (regulating "identification signs"); 1163.12(g) (regulating "temporary business signs"); 1163.12(h) (regulating "multiple use business identification signs"); and, 1163.12(j) (regulating "service station island signs"). Under *Central Hudson*'s third prong, the Magistrate Judge stated that the City "has provided no evidence that would support the contention that the content-based restrictions in [these sections] directly and materially contribute to safety and aesthetics." The Magistrate Judge then correctly determined that these content-based restrictions do not directly and materially advance the City's interest in safety and aesthetics and the City failed to provide any evidence to the contrary.

In addition to these four sections, the ordinance contains other sections that restrict signs bearing commercial messages in a content-based manner. The ordinance's classifications by use section specifically includes, permits, or excludes protected commercial speech. *See* §§ 1163.03(a), 1163.09(a). As noted in the noncommercial speech discussion above, the classifications by use section categorizes, defines, and/or limits signs by their content. The content of a sign determines whether it is allowed to be erected in a business district. Identification signs, directional signs, project signs, real estate signs, and nameplates are permitted in business districts. Ord. § 1163.09(a). These signs may include either commercial or noncommercial speech. The ordinance contemplates business or professional uses in the definition of identification, nameplate, project, and real estate signs. Ord. § 1163.03(a)(1)C, F; § 1163.03(a)(2)A, B.

Bulletin boards, organizational signs, and information signs are banned in business districts. While these signs, along with murals and political signs, include

primarily noncommercial speech, they may also include commercial messages.[11] These commercial speech elements are protected under the First Amendment. There is no evidence that these signs might be less safe or less aesthetically pleasing than other signs in the City's business districts. Further, it is unclear why signs with certain content (*e.g.*, identification or nameplate signs) have certain size restrictions when they can be placed adjacent to a sign that is permitted to be much larger in size because it contains other content. This does not further the City's goals of safety and aesthetics in any meaningful way.

Commercial speech advertising is banned from "directional signs," where the shape or content indicates the direction of pedestrian and vehicular circulation routes on the lot on which the sign is located. Ord. § 1163.03(a)(1)B. Thus, a sign in the shape of an arrow in front of a business with either the words "Honda Service" or the McDonalds "golden arches" logo is in violation of the ordinance, while a sign with the words "Enter Here" is not.

"Identification signs" may contain content indicating the name and address of a business, office, or industrial establishment. Ord. § 1163.03(a)(1)C. While such signs may, for "business purposes," include the "principal type of goods sold or services rendered," they may not include "the listing of numerous goods and services, prices, sale items, and telephone numbers[.]" *Id.* "Information signs" are allowed only for public and semi-public uses. Thus, a bank identification sign may not contain a clock, but a post office identification sign may. Ord. § 1163.03(a)(1)D.

Sections 1163.10, 1163.11, and 1163.12 of the ordinance regulate "Business Signs." The content of a sign identifying an office

---

**11.** For example, a directional sign in the shape of an arrow with the words "Auto Body Shop" or "Eat Here" has an element of commercial speech in it, as does a bulletin board on the lot of a library that reads "Book Sale", an organizational sign with a new member meeting date on it (where new members are required to pay a fee), a mural of a person taking a bite out of a sandwich on the side of a sandwich shop, or a political sign in front of a fruit stand that reads "Stop Dangerous Pesticide Use—Buy Organic!"

or retail business determines in whole or in part the maximum sign face area allowable, the location of a sign, and the number of signs permitted. If a sign is used to identify a retail business or service, its sign face area "shall be related to the width (frontage) of the building" and the sign is measured and limited by the detailed formulae provided by §§ 1163.10, 1163.11. For example, the total maximum sign face area permitted for office and retail business and use is determined by the formula: business building width × 1.0 foot. Ord. § 1163.11(b). Other signs with different content are not required to be related to building frontage. A sign used for a public facility, for example, does not contain these restrictions. Ord. § 1163.08. Rather, the maximum sign face of a public facility sign is "determined by the Building Official." *Id.*

While the City could properly regulate the size of all signs within certain districts in a content neutral fashion,[12] the City must justify its restrictions when it attempts to regulate certain signs within certain districts because of the content of the sign. Here, only those signs in a business district that identify an office, retail business, or retail service are regulated. As noted above, the City's interests in regulating commercial speech are safety and aesthetics. However, this regulation neither directly and materially advances the City's asserted interests, nor provides for a carefully calculated and reasonable fit. The City has not adequately demonstrated that "its restriction will in fact alleviate [the harms] to a material degree." *Greater New Orleans,* 119 S.Ct. at 1932.

It is not clear how these formulae relate to safety. If the rationale is that larger signs threaten traffic safety by posing larger distractions (although larger signs might actually be safer because more legible), the relative danger of any sign is determined not by the sign, but by the relative size of the building on which the sign is affixed. Thus, under this ordinance, the larger the building, the more dangerous the sign. And even if the City provided a maximum size limit to these signs,[13] it is not clear why other signs in business districts, such as public facility signs, are not limited in a similar fashion. Signs with content other than identifying a business are not somehow safer. Nor is the content—mere letters and numbers—more aesthetically pleasing. If the assumption of the formulae is that all signs of the maximum area would be *relatively proportional* to the building on which the sign was affixed (*e.g.,* the total width of the building × 1.0 foot), not all signs are required to be the maximum permissible size and, therefore, not all signs would be relatively proportional to their buildings.

An identification sign that is located on a wall may not exceed 75 square feet in sign face area or four feet in vertical dimension, while an identification sign that is placed either on a pylon or on a ground sign is limited to 65 and 50 square feet sign face area and eight and five foot height limits respectively. An identification sign placed on a projecting sign must not exceed nine square feet, while an identification sign placed on a canopy must not exceed 18 inches in height. Ord. § 1163.12(a), (b), (c), (d). A temporary project sign may not exceed 32 square feet in sign face area. Ord. § 1163.12(f). A sign indicating direction must not exceed three feet in sign face area. Ord. § 1163.12(e). When a sign's content identifies a service entrance, the sign must be attached to the building

**12.** See *City of Ladue v. Gilleo,* 512 U.S. 43, 48, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994), for approval of the regulation of the physical characteristics of signs. In addition, the City could ban off-site commercial billboards if it found them to impinge on traffic safety and aesthetics. *Id.* at 49, 114 S.Ct. 2038 (citing *Metromedia,* 453 U.S. at 511–12, 101 S.Ct. 2882).

**13.** The City attempts to provide a limit to "wall signs" of 75 square feet in sign face area. However, the illustration the City provides at page 145 of the ordinance shows a maximum sign face area for a wall sign on Unit D as 104 square feet, thereby seemingly violating its own ordinance.

and may not exceed two square feet. Ord. § 1163.10(c).

Temporary signs announcing sales, new products, or special business events, must be placed on the inside surface of windows and doors and must not exceed 50% of the window area despite the size of the window. Ord. § 1163.12(g). These signs cannot be displayed for more than 30 consecutive days. *Id.* If temporary signs announcing sales, new products, or special business events are attached to surfaces other than the windows of the main building (*e.g.,* hanging from the ceiling), or if the sign is a mobile or movable, it is illegal. *Id.* A temporary sign which speaks of the sale, rental, or leasing of property must not exceed 32 feet in face area and may not be illuminated. *Id.*

In a business area containing more than one building designed as a coordinated unit, or where a business building contains more than one unit, an identification sign containing the identity of an individual store must be attached to the building or unit. Ord. § 1163.12(h). However, an identification sign that is located on a pylon or ground sign may indicate the name of the building or shopping location, but may not indicate the name of the individual stores. *Id.*

Automobile service stations are permitted to place information signs at fuel pumps and other service islands. Ord. § 1163.12(j). Service station owners are limited to displaying "information regarding the type of service provided and other information essential in directing and instructing the motoring public." *Id.* The owner of a service station is specifically prohibited from placing identification or business signs on "any part of a pump or island canopy." *Id.*

Where businesses have come together in an office park—"a unified development of three or more office buildings serviced by a common access drive"—they are allowed one identification ground or pylon sign that "shall only identify the name and address of the office park." Ord. § 1163.12(k). The maximum single face sign area of this sign may not exceed 75 square feet. *Id.*

The City has not provided any evidence to show why their content-based restrictions directly and materially contribute to their goals of safety and aesthetics.[14] In fact, many of the City's content-based restrictions completely fail to contribute to safety and aesthetics and seem to be unrelated to these goals. The City's sign ordinance as a whole lacks rationality. In addition, the City has not demonstrated narrow tailoring of the regulation to its asserted interests nor has it demonstrated that it carefully calculated the costs and benefits associated with the burden on speech imposed by its regulation. The City's content-based regulations on commercial speech are unconstitutional.

### 3. The Selective Ban of Pole Signs

■ The Magistrate Judge held that the City's purported ban on pole signs is an impermissible content-based restriction on speech. The City objects. A "pole sign" is "a sign which is supported or suspended from a freestanding column or columns and designed so as to permit pedestrian or vehicular movement thereunder." Ord. § 1163.03(b)(2)B. The City purports to expressly prohibit pole signs

---

**14.** In a footnote, the City stated that if it has not satisfied the third prong, "this Court should deny both cross-motions for summary judgment and find a genuine issue of material fact that should be tried." (Def.'s Objections at 11 n. 6.) (Although in its Motion for Summary Judgment at 1, the City argued that "this case should be resolved solely on the resolution of questions of law.") However, as stated above, the City bears the burden of identifying a substantial interest and justifying the challenged restriction. *See Greater New*

*Orleans,* 119 S.Ct. at 1930. Under FED. R.CIV.P. 56(e), "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing there is a genuine issue for trial." The City has not provided any evidence justifying the challenged content-based restrictions and thus it has failed to satisfy its burden.

"in all zoning districts of the City", Ord. § 1163.22(a), but in fact does not.

The ordinance exempts a number of signs from the pole sign prohibition. All official public notices, and the flag, emblem, or insignia of all governmental bodies are exempted from the ordinance. Ord. § 1163.02. Temporary displays or signs in connection with a charity drive or to advocate the election of a candidate or the passage or disapproval of an issue are exempted for explicit time periods. Ord. § 1163.27.

An exemption from an otherwise permissible regulation of speech may represent a governmental attempt to give one side an advantage in expressing its views and may diminish the credibility of the government's rationale for restricting speech in the first place. *See City of Ladue*, 512 U.S. at 51–53, 114 S.Ct. 2038. As the Magistrate Judge correctly determined, a content-based exemption from a ban is no less a content-based distinction because it is phrased as exempting certain speech from a ban rather than as imposing the restriction only on the burdened class of speech. *See City of Ladue*, 512 U.S. at 48–53, 114 S.Ct. 2038; *Discovery Network*, 507 U.S. at 429, 113 S.Ct. 1505. Content-based restrictions of fully protected speech receive strict scrutiny.

The City argues that the pole sign ban is content neutral [15] because the governmental exemptions are based on the physical ownership of the sign rather than on the content of its message. It also argues that the Court should read the ordinance as only exempting government-owned signs. These arguments do not save the City's content-based pole sign ban. The City's rationales for the ban are safety and aesthetics.[16] It cannot be said that the government's pole signs—whether they are for the city recreational complex or city hall— are somehow less distracting or more pleasing to the eye than the pole sign of a private individual or business.

Regarding the exemption of political signs from the pole sign ban, the City urges the Court to construe the exemption to avoid a constitutional defect. This would require inserting a clause into the problematic § 1163.27 that reads covered political signs "shall not be governed by the provisions of this chapter *except § 1163.22* provided the same are removed within 10 days of the completion of the drive or election." [17] The Court declines to redraft the ordinance. *See Eubanks v. Wilkinson*, 937 F.2d 1118, 1122 (6th Cir. 1991) (holding that while federal courts will construe ambiguities in statutes to

---

**15.** Content-neutral time, place, or manner restrictions on protected noncommercial speech, as well as truthful, nonmisleading commercial speech, are subject to intermediate scrutiny, *i.e.*, restrictions are content neutral if it is determined that they " 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant government interest, and that they leave open ample alternative channels for communication of the information.' " *Ward*, 491 U.S. at 791, 109 S.Ct. 2746 (citations omitted). The *Ward* Court noted that this test is equivalent to the *O'Brien* intermediate scrutiny test used for regulation of expressive conduct. *Id.* at 798–99, 109 S.Ct. 2746; *see also Turner*, 512 U.S. at 662, 114 S.Ct. 2445 (citing *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968)).

**16.** The City's rationales are not well supported in the record. To the extent that pole

signs are more hazardous than other types of signs because, *per* § 1163.02, they conflict with traffic control signs (not an obvious conclusion—a six-foot pylon sign would seem to be as hazardous), the City could restrict their distance from corners and traffic signs, or limit their height. To the extent that pole signs are simply that much more aesthetically displeasing than other signs (*i.e.*, pylon or ground signs), the least restrictive alternative (if it is content neutral and provides ample alternative channels of communication) may well be to attempt to ban all pole signs in the City or to ban off-site commercial pole signs. *See Metromedia*, 453 U.S. at 511–12, 101 S.Ct. 2882.

**17.** Because pole signs are defined as those signs that are "designed so as to permit pedestrian or vehicle movement thereunder," the pole sign ban does not affect political lawn signs, real estate signs, or any other sign that a person or vehicle cannot travel under.

avoid constitutional difficulty when "fairly possible," "the general federal rule is that courts do not rewrite statutes to create constitutionality.").

Moreover, where an exemption creates a constitutional defect, the remedy is usually to strike the exemption. However, because the City's ordinance is riddled with unconstitutional provisions that cannot be parsed out, the ordinance falls in its entirety. It would be an exercise in futility for the Court to strike certain exemptions when the entire ordinance cannot survive.

## C. Prior Restraint

The Magistrate Judge determined that the ordinance contains an illegal system of prior restraint. The City broadly responds that zoning code provisions requiring building permits are not prior restraints upon speech, even when the permit is sought for the purpose of engaging in activity protected by the First Amendment. While it may be true that a zoning code provision that requires a permit in order to build a facility that does not implicate speech is not a prior restraint on speech, the City is gravely mistaken that a permit sought for the purpose of engaging in an action that implicates protected First Amendment activity is not a prior restraint on speech.

The City relies on *Christy v. Randlett*, 932 F.2d 502 (6th Cir.1991) for support of its argument. In *Christy*, the Sixth Circuit held that the plaintiff was not denied her constitutionally mandated procedural safeguards because the zoning ordinance at issue, prohibiting the operation of adult businesses within 500 feet of a residential area, was constitutionally valid as a content-neutral time, place, or manner restriction related to the nature of the facility and was reasonably specific and precise in its wording. By contrast, the City's ordinance is neither content neutral nor reasonably specific and precise in its wording.

A system of prior restraint exists when speech is conditioned upon the prior approval of public officials and may work to inhibit or suppress communication before it reaches the public. *See Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 553–58, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). "Prior restraints are not unconstitutional per se"—*e.g.,* they may stand when the restraint is on unprotected communication or when a permit scheme is used to regulate competing uses of public fora, *see Forsyth County v. The Nationalist Movement,* 505 U.S. 123, 130, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992)—but any system of prior restraint must meet certain constitutional requirements and bears "a heavy presumption against its constitutional validity." *Southeastern Promotions,* 420 U.S. at 557, 95 S.Ct. 1239 (citations omitted).

The Supreme Court has stated that any permit scheme controlling the time, place, and manner of speech must not be based on the content of the message, must be narrowly tailored to serve a significant governmental interest, and must leave open ample alternatives for communication; that is, it must pass intermediate scrutiny. *Forsyth County,* 505 U.S. at 130, 112 S.Ct. 2395 (citing *United States v. Grace,* 461 U.S. 171, 177, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983)). In addition, the Supreme Court has "identified two evils that will not be tolerated in such schemes. First, a scheme that places 'unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship.' ... Second, a prior restraint that fails to place time limits on the time within which the decisionmaker must issue the license is impermissible." *FW/PBS,* 493 U.S. at 225–26, 110 S.Ct. 596.[18]

18. Defendants argue that the Magistrate Judge has improperly commingled two distinct lines of case law regarding prior restraints. (Def.'s Objections at 6.) They proffer that there is one line for the restraint of "pure speech" and another for "mixed speech" (which contains expressive and nonexpressive conduct). Defendants are incorrect. First, if a time, place, or manner restriction on First Amendment activity fails the intermediate

■ The City's permit scheme reads: "A sign permit shall be required for all permanent and temporary signs over six square feet in sign face area in any zoning district." Ord. § 1163.16(a). A fee for the permit is established by separate ordinance. Ord. § 1163.16(b). Each application for a permit shall be accompanied by drawings showing the width and depth of the building face; the sign design and layout in detail; the types of lamps and lenses for illuminated signs; the exact location of the sign; colored photographs of the building; and, details and specifications for construction. Ord. § 1163.16(c).

Thereafter, the "Building Official *may* forward the application and drawings to the Architectural Review Board." Ord. § 1163.16(d) (emphasis added). The ordinance further states:

The Building Official shall review the application and drawings to determine whether the proposed sign meets the standards, criteria and furthers the purpose and intent of this chapter. In addition to *other facts and circumstances* related to the foregoing standards, criteria, purpose, and intent, the Building Official *shall* consider:

(1) The design, size, shape, color, illumination, location and orientation of the sign in relation to the site and topography, other structures on the site, adjacent and neighboring land uses, sites and buildings;

(2) The visual impact and influence of the proposed sign in relation to and

in conjunction with signs currently existing or those reasonably expected to be erected in the vicinity of the proposed sign location; and

(3) The maximum requirements and other regulations of this Zoning Code governing the use, location, size and character of signs.

The Building Official shall approve or disapprove the proposed sign based upon the findings of his review. Following approval, a sign permit *may* be issued by the Building Official upon his determination that the proposed sign is designed to meet all other applicable laws and regulations.

Ord. § 1163.16(d) (emphasis added).

The City's permit system is not content neutral. The sign ordinance requires the building official to consider the design, color, orientation, visual impact and influence, as well as the "regulations of this Zoning Code governing the use, location, size and character of signs" in deciding whether or not to issue a permit. As discussed above, the sign ordinance governing the use, location, size, and character of signs is riddled with impermissible content-based distinctions. In deciding whether to issue a permit for any sign over six square feet in area, the building official must consider these content-based distinctions as well as those contained in § 1163.16(d). Thus, the permit scheme is an illegal system of prior restraint. *See Forsyth*, 505 U.S. at 130,

scrutiny test, it is unconstitutional. *See Ward*, 491 U.S. at 798, 109 S.Ct. 2746. Second, where there is a permit scheme in place that conditions First Amendment activity on the prior approval of public officials, it must neither (1) give unbridled discretion to a licensing official nor, (2) lack procedures that will ensure prompt judicial review (the usual "two lines" of prior restraint law). For example, a content-neutral law regulating noise or a ban on "loud and raucous" sound trucks is permissible. *See Ward*, 491 U.S. 781, 109 S.Ct. 2746; *Kovacs v. Cooper*, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949). However, a restriction on the use of such an amplification device "without the permission of the chief of police" is not. *See Saia v. New York*, 334 U.S.

558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948). In the matter at hand, the City could permissibly enact a content-neutral height restriction on all signs or even, perhaps, a ban on all pole signs. However, where the restriction is not content neutral, narrowly tailored, and does not leave open ample alternative channels of communication, it fails. It also would fail (1) if the ordinance required the issuance of a permit which was left to the unfettered permission or discretion of a government official or, (2) if the denial of a permit did not allow for a prompt judicial determination. The same lines of caselaw are as true for signs ("mixed speech" in Defendant's parlance) as they are for parades or musical theater ("pure speech" for Defendant).

112 S.Ct. 2395; *Southeastern Promotions*, 420 U.S. at 554, 95 S.Ct. 1239.

In addition to not being content neutral, the City's permit scheme contains both of the other "evils that will not be tolerated." *FW/PBS*, 493 U.S. at 225–26, 110 S.Ct. 596. It vests unbridled discretion in the City's building official and it lacks the constitutionally-required procedural safeguards.

It is well settled that " 'a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license' must contain 'narrow, objective, and definite standards to guide the licensing authority.' " *Forsyth*, 505 U.S. at 131, 112 S.Ct. 2395 (quoting *Shuttlesworth v. Birmingham*, 394 U.S. 147, 150–51, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969)). This is so "because without standards governing the exercise of discretion, a government official may decide who may speak and who may not based upon the content of the speech or viewpoint of the speaker." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 763–64, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988) (citations omitted). If a statute gives licensing officials overbroad and unbridled discretion because it lacks the proper standards for applying the law, it is void on its face. *Id.* at 755–57, 108 S.Ct. 2138.

Magistrate Judge Hemann thoroughly examined those portions of the ordinance that provide reasonably narrow, objective, and definite standards; those sections that are more subjective and leave the discretion of the building official relatively unfettered; and, those portions which leave the decisionmaker's discretion entirely unconstrained. (Report and Recommendation at 17–21.)

The City did not specifically object to the Magistrate Judge's conclusions; rather, the City argued generally that the "application of zoning regulations to unexpres-

sive conduct such as erecting structures is constitutional, and does not involve prior restraint." (Def's Objections at 6.) The City does not have any "specific written objection" to the Magistrate Judge's conclusions, *see* FED.R.CIV.P. 72(b), and neither does this Court. The Magistrate Judge's analysis of the ordinance is correct, as is her conclusion that the ordinance lacks sufficiently narrow, objective, and definite standards which, therefore, gives government decisionmakers unfettered discretion in issuing a permit. The permit scheme provides the City's officials with unbridled discretion; it is unconstitutional.

Moreover, in order to avoid constitutional infirmity, a permit scheme must contain three procedural safeguards. First, the decision whether to issue a permit must be made within a "specified brief period," and if judicial review is sought, the status quo must be preserved pending "a final determination on the merits." *Freedman v. Maryland*, 380 U.S. 51, 59, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). Second, the scheme "must also assure a prompt final judicial decision, to minimize the deterrent effect of an interim and possibly erroneous denial of a license." *Id.*[19] Third, a censorship scheme must place the burden of instituting judicial proceedings and proving that the expression is unprotected on the censor. *Id.* at 58, 85 S.Ct. 734. *See also Southeastern Promotions*, 420 U.S. at 560, 95 S.Ct. 1239.

The City did not submit any "specific written objection" to this portion of the Magistrate Judge's Report. *See* FED. R.CIV.P . 72(b). Even if it had, the City's objections would not be well-taken. As the Magistrate Judge demonstrated, the City's ordinance does not adequately provide for any of the three procedural safeguards. *See* Report and Recommendation at 21–23.

---

**19.** While some circuits have held that the mere availability of a judicial forum may satisfy the prompt judicial review requirement, the Sixth Circuit takes *Freedman* at its word: a permit scheme must ensure a prompt judi-

cial determination, not mere access to review. *See East Brooks Books, Inc. v. City of Memphis*, 48 F.3d 220, 224, *reh'g denied*, (6th Cir.1995), *cert. denied*, 516 U.S. 909, 116 S.Ct. 277, 133 L.Ed.2d 198 (1995).

First, the sign ordinance does not specify the "brief period" in which the official must make her decision. Second, the ordinance fails to provide for a prompt judicial determination. An appeal to the architectural review board is insufficient; the review must be made by "an independent branch of government." *Freedman*, 380 U.S. at 57, 85 S.Ct. 734. Moreover, requiring a rejected applicant to file a civil lawsuit pursuant to Chapter 2506 of the Ohio Revised Code does not provide a constitutionally adequate avenue of prompt judicial review of a decision to restrain protected expressive activity. *See J.L. Spoons, Inc. v. City of Brunswick*, 18 F.Supp.2d 775, 779 (N.D.Ohio 1998) (citing cases). The process a denied applicant must go through pursuant to Chapter 2506 is too lengthy, does not require a court to rule on the merits of an appeal within a specified period of time, and does not provide adequate procedures to minimize the suppression of speech pending judicial review. *Id.* Third, the sign ordinance does not place the burden of instituting judicial proceedings and proving that the expression is unprotected on the censor.

In sum, a system of prior restraint that fails to provide these procedural safeguards does not comport with the Constitution. The City's permit scheme violates the First Amendment because it fails to provide the procedural safeguards that are necessary for a lawful system of prior restraint.

### III. Plaintiffs' Equal Protection Challenge

The Magistrate Judge recommended that the Court find § 1163.03(a)(1)A and E unconstitutional under the Equal Protection Clause of the Fourteenth Amendment. Applying strict scrutiny, the Magistrate Judge determined that the City had not advanced a compelling interest served by the distinctions between speakers in those sections. The City raises two objections: (1) the language in the provisions at issue should be construed as descriptive language and not prohibitive language, and should be construed as constitutional rather than unconstitutional; and, (2) even if the provisions are unconstitutional, this is insufficient to justify striking down all of Chapter 1163.

The City's objections are not convincing. First, the language of the provisions at issue is both descriptive and proscriptive. By describing a "bulletin board" as "an announcement sign which directs public attention to and is located on the lot of a public or semi-public institution," the ordinance *describes* a "bulletin board," but also *proscribes* all but public or semi-public institutions from having them. It is important as to who may and may not have "bulletin boards" because that designation allows or prohibits other content. For example, "informational signs"—which are the only type of signs that are allowed to have changeable copy—are permitted solely as "an integral part of a permitted identification sign." Whereas business identification signs may only contain the name, address, and principal type of goods sold or services rendered (and thus are barred from having informational signs and moveable copy), public facilities are permitted to have one "identification-bulletin board" which may include changeable copy in an integrated informational sign.

The same is true of "organizational signs." Because they are defined as "devoted exclusively to the identification of national, state, and local service clubs," private clubs, or even international service clubs, may not have an organizational sign that identifies the club, its location, and its meeting times.

Second, this Court is not striking down the entire ordinance merely because these two provisions are unconstitutional; rather, the entire ordinance is invalid because it is so riddled with content-based distinctions, *see supra*, that the offending portions cannot be severed without disrupting the entire ordinance. *See infra.*

It is well-settled that a statute challenged on equal protection grounds at a minimum must pass rational-basis review; *i.e.*, it must be rationally related to a legitimate government purpose. *See Clark v.*

*Jeter,* 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988) (citations omitted). Quasi-suspect classifications, such as those based on gender or illegitimacy, receive intermediate scrutiny. *Id.* (citations omitted). Suspect classifications, such as those based on race or national origin, as well as those classifications that affect fundamental rights, are subject to strict scrutiny. *Id.* (citations omitted).

▆▆▆ Where an ordinance affects rights protected under the First Amendment, strict scrutiny is applied "because it implicates a constitutionally protected fundamental right, the right to freedom of speech." *Lac Vieux Desert Band of Lake Superior Chippewa Indians,* 172 F.3d at 410 (citing cases). The City, even in its objections to the Report and Recommendation, has not advanced a compelling interest that is served by the distinctions between speakers in these provisions; nor has the City shown that those distinctions are the least restrictive means for serving any purported interests.

Even assuming that the City's interests of safety and aesthetics are the reasons for the distinctions, these distinctions are not "necessary" to serve these interests. In fact, the distinctions do not seem to be even "rationally related" to the City's interests. It is beyond reason to think the signs of public or semi-public entities are inherently safer or more aesthetically pleasing than the signs of business entities, or that the sign of a national, state, or local service organization is safer or more beautiful than that of a private or international service organization.

In sum, § 1163.03(a)(1)A and E violate the Equal Protection Clause on their face because they distinguish between and classify speakers in a manner that affects fundamental rights protected by the First Amendment.

**20.** *See* Kathleen M. Sullivan, *Discrimination, Distribution, and City Regulation of Speech,* 25 HASTINGS CONST L.Q. ·209, 209, 216–17 (1998) (outlining five basic principles that should guide municipal regulation of speech). The Court also recognizes that, because the Constitution is not stagnant, city officials have

## IV. Severability of the Ordinance

▆▆▆ The Magistrate Judge correctly determined that the unlawful portions of the sign ordinance cannot be severed without fundamentally disrupting the intention of the drafters. "Severability of a local ordinance or state law is a question of state law...." *City of Lakewood,* 486 U.S. at 772, 108 S.Ct. 2138. As the Supreme Court of Ohio explained, "in order to sever a portion of a statute, we must first find that such severance will not fundamentally disrupt the statutory scheme of which the unconstitutional provision is a part." *State ex rel. Maurer v. Sheward,* 71 Ohio St.3d 513, 644 N.E.2d 369, 377 (1994), *cited with approval in Women's Medical Professional Corp. v. Voinovich,* 130 F.3d 187, 202 (6th Cir.1997) *and Ohio Citizen Action v. City of Seven Hills,* 35 F.Supp.2d 575, 580 (N.D.Ohio 1999). Because severance of the unconstitutional portions would fundamentally disrupt the statutory scheme as a whole, the illegal provisions are not severable and the ordinance is struck down in its entirety.

The Court is sympathetic to the City's desire to provide its citizens with a safe and aesthetically pleasing place to live and recognizes that city officials and law directors are often "obligated to be on the front lines of conflict between public regulation and freedom of speech." [20] However, the means and ends of regulations which implicate First Amendment freedoms must withstand scrutiny. Because the City's sign ordinance contains a thicket of content-based distinctions, an impermissible system of prior restraint, and violates equal protection, it fails constitutional scrutiny.

## V. Other Issues

The City objected to the Magistrate Judge's Report and Recommendation re-

the sometimes difficult obligation to keep apace with changes—such as changes in the commercial speech doctrine—that affect their laws and citizens. However, this is the solemn charge and obligation of city officials and law directors.

garding counts one, two, three, four, and five. (Def.'s Objections at 2.) For the reasons set out above, the Court rejects the City's objections as to counts one, four, and five. The Court does not reach Plaintiffs' claims of vagueness (count two), overbreadth (count three), OHIO REV.CODE § 713.15 (count eight), or violations of due process (count nine), which are now moot. As noted above, because the illegal provisions in the ordinance are not severable, Chapter 1163 is struck down in its entirety, thus rendering counts two, three, eight, and nine moot.

Plaintiffs did not object to the Magistrate Judge's determination regarding count six and seven. The Court adopts the Magistrate Judge's Report and Recommendation regarding these counts as Plaintiffs have conceded that their substantive due process claim (count six) is subsumed by their First Amendment claims and the Court finds Plaintiffs' Fifth Amendment takings claim is unripe (count seven).

The only claim remaining is Plaintiffs' claim of retaliatory enforcement in violation of the First Amendment (part of count one). The City moved to dismiss this claim pursuant to FED.R.CIV.P. 12(b)(6). (Def.'s Reply in Support of Summ.J. and in Opp'n to Pls.' Mot. for Summ. J. at 1). Plaintiffs have properly stated a claim. However, neither party adequately nor fully briefed this issue—which would include caselaw and the appropriate standards—so that a determination could be made on a converted motion for summary judgment. *See* FED.R.CIV.P. 12(b); 56. (*See* Def.'s Reply in Support of Summ. J. and in Opp'n to Pls.' Mot. for Summ. J. at 24–25; Pls.' Reply in Opp'n to Def.'s Mot. for Summ. J. and in Support of Their Cross–Mot. For Summ. J. at 25–26.) *See also Bloch v. Ribar*, 156 F.3d 673, 678–82 (6th Cir.1998) (setting out the appropriate standards for a First Amendment retaliation claim). Whether this claim would hold up after appropriate briefing on a motion for summary judgment is questionable; however, it survives the City's Motion to Dismiss.

## Conclusion

For the foregoing reasons, Plaintiffs are entitled to judgment as a matter of law on counts one (except the retaliation claim), four, and five of their Amended Complaint. The City's ordinance is impermissibly content based, contains an illegal prior restraint, and violates equal protection. Plaintiffs' Cross–Motion for Partial Summary Judgment (Document # 24) is GRANTED in respect to these counts. Thus, the City is enjoined from enforcing CHAPTER 1163 OF THE CODIFIED ORDINANCES OF NORTH OLMSTED. Counts two, three, six, eight, and nine of Plaintiffs' Amended Complaint are moot. Count seven is not ripe for adjudication in this Court. Defendant's Motion for Summary Judgment (Document # 22) is GRANTED in regard to count seven of Plaintiffs' Amended Complaint. Plaintiffs' retaliation claim (part of count one) survives the City's Motion to Dismiss. Trial before this Court of Plaintiffs' retaliation claim is set for Monday, April 10, 2000, 8:30 a.m., at the United States District Court, 201 Superior Avenue, Room 400, Cleveland, Ohio.

IT IS SO ORDERED.