**ONSITE ADVERTISING SERVICES, LLC Petitioner,**

v.

**The CITY OF SEATTLE, Respondent,**

**Squire Properties, Additional Party.**

**No. C00–1497L.**

United States District Court, W.D. Washington.

March 26, 2001.

Patrick J Schneider, Stoel Rives LLP, Seattle, WA, for Onsite Advertising Services, LLC.

Eleanore S. Baxendale, Seattle City Attorney's Office, Seattle, WA, for the City of Seattle, Squire Properties.

## ORDER GRANTING FINAL JUDGMENT

LASNIK, District Judge.

A bench trial in this matter was conducted on March 19 and 20, 2001 before this Court. Petitioner Onsite Advertising Services, LLC ("Onsite") argued that the City's refusal to grant an on-premise permit for the Miller Brewing Company ("Miller") sign on the Squire building was an incorrect statutory interpretation of the Seattle Municipal Code ("the Code"). It also argued that the City's interpretation and/or application of the Code is unconstitutional because: (1) it is a content-based restriction that does not survive intermediate scrutiny; (2) it constitutes a prior restraint on speech; and (3) it violates Onsite's right to equal protection. Finally, Onsite argued that an exemption to the Seattle Building Code allows it to place the Miller sign on the Squire building without obtaining a permit. For the following reasons, the Court grants judgment in favor of the City.

## I. FACTS

Based upon the testimony of witnesses and documents offered into evidence, the following facts were established at trial. Onsite informed Miller that an important advertisement spot was opening up on the Squire building [1] and told Miller about Seattle's on-premise requirement. Subsequently, Miller rented a small office for $325 a month in the Squire building. The parties agree that Miller is a legitimate tenant and that its use of the office is limited to one employee who works in the area of marketing.

On June 14, 2000, Onsite applied for an on-premise sign permit for Miller. The sign at issue is one that depicted a bottle of Miller beer and included Miller's current advertising slogan for its MGD branded beer, "Never miss a genuine opportunity." Chris Champlin, the City's sole sign inspector, sent a letter to Onsite on June 26, 2000, denying a sign permit because beer was neither sold nor produced on the premises and the sign (a beer bottle) did not represent what Miller did at the Squire building. In July of 2000, Onsite sent the City five different versions of a possible Miller sign in hopes of getting a permit. The sign that was finally approved and recently painted on to the Squire building has a picture of Mount Rainier and the Miller logo. Onsite requested a formal interpretation of the City's definition for on-premise signs and received one on August 11, 2000. Onsite challenges this interpretation, which denied Miller the ability to display its beer bottle on the sign.

---

1. There are actually two signs on the Squire building, one on the north wall and one on the south wall. These signs are a valuable commodity in Seattle. They are prominently placed near Safeco Field. They are non-conforming signs with some of the largest dimensions (150 feet by 32 feet) available in Seattle. Prior to the Miller sign, the City had allowed other signs for The Squire Shop (a long-term tenant in the building), Union Bay Sportswear, and the Seattle Seahawks on the building. The Squire Shop and Union Bay Sportswear signs displayed only their company name or logo, without a picture of a product. The Seahawks sign had a picture of a player and was associated with the ticket office inside the building. Because of the location and the size of these two signs, Miller pays Onsite $15,000 a month for the two Squire building signs.

When the City issues on-premise sign permits, it sometimes does so on the word of the contractor because its lone inspector cannot visit every site. However, the City does conduct a final inspection of the sign once it is installed to check that it conforms with the proposal. If the City receives information that a sign may be in violation of its Code, as when the City received a letter on behalf of Onsite from Mr. Schneider, the City investigates the sign at issue.

## II. DISCUSSION

### A. *Statutory Interpretation of Seattle Municipal Code*

Section 23.84.036 of the Code defines an on-premise sign as:

a sign or sign device used solely by the business establishment on the lot where the sign is located which displays either (1) commercial messages which are strictly applicable only to a use of the premises on which it is located, including signs or sign devices indicating the business transacted, principal services rendered, goods sold or produced on the premises, name of the business and name of the person, firm or corporation occupying the premises; or (2) noncommercial messages.

In contrast, an off-premise sign is one that relates to a business activity, use, product or service not available on the premises upon which the sign is located.

■ It is undisputed by the parties that Miller had a legitimate presence on the premises. Nonetheless, the Department of Design, Construction and Land Use ("DCLU") determined that Miller's sign did not qualify as an on-premise sign because it depicted a product that was neither sold nor produced on the premises. Per Onsite's request, the DCLU issued an interpretation of the definition of an on-premise sign, in its Interpretation No. 00–

002 on August 11, 2000. The interpretation applied the Code's definition of an on-premise sign and found that the Miller sign was not an on-premise sign because it advertised beer, a product neither sold nor produced on the premises.

Onsite argues that the City has taken merely one of the examples of what an on-premise sign may be and has turned it into the sole requirement for an on-premise sign. Onsite contends that the phrase "including signs or sign devices indicating the business transacted, principal services rendered, goods sold or produced on the premises" is an example of an appropriate on-premise sign, not a mandate.

The standard for judicial review of the City's interpretation is whether the DCLU erroneously interpreted the Code, after according deference due to the local body for its expertise in this area. *See* RCW 36.70C.130. The Court is not persuaded that Interpretation No. 00–002 is an erroneous interpretation of the Code. The City cannot possibly list every example of what might be appropriate for an on-premise sign. Therefore, the Code must give direction as to what is acceptable for an on-premise sign. The Court finds that the "including" language cited by Onsite narrows the language preceding it. The language that precedes it states that the commercial message must be limited to "a use of the premises on which it is located."

The ordinance is not designed to allow a company to advertise a good or service that it does not sell or produce at the site. That would abolish the difference between on-premise and off-premise signs. The Court holds that the City's interpretation of the Code is a reasonable one and is not erroneous.

### B. *Content–Based Regulation and the Central Hudson Test*

■ Onsite argues that the City refused to grant a permit for the Miller sign

because of its content. The City's Code is a content-based restriction because it requires a nexus between the business office and the content on the sign. When commercial speech is subject to government restrictions, a four-part test is applied to determine the validity of the restriction. The test inquires: (1) whether the speech is misleading or related to unlawful activity; (2) whether the government has a substantial interest; (3) whether the regulation directly advances the government interest involved; and (4) whether the restriction is no more extensive than necessary to accomplish the government's objective. *See Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n,* 447 U.S. 557, 566, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980).

Onsite and the City agree that prongs one and two are satisfied because the commercial speech at issue was lawful and truthful, and the City has a substantial interest in regulating traffic safety and aesthetics. This Court is left to decide whether the regulation directly advances the City's interest and whether it is no more restrictive than necessary.

Onsite argues that the City's content-based restriction upon on-premise signs does not advance the City's interest in traffic safety and aesthetics because a tenant of the Squire building could have the same size sign in the same location with different content. That would not further an interest in aesthetics or traffic safety. The City argues that Onsite misunderstands prongs three and four of the *Central Hudson* test and that *Metromedia* establishes as a matter of law that the City's Code satisfies intermediate scrutiny.

■ . In *Metromedia,* the Supreme Court upheld a similar code for the city of San Diego and found that "the city could reasonably conclude that a commercial enterprise—as well as the interested public—has a stronger interest in identifying its place of business and advertising the products or services available there than it has in using or leasing its available space for the purpose of advertising commercial enterprises located elsewhere." *Metromedia, Inc. v. San Diego,* 453 U.S. 490, 512, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981). The Ninth Circuit has interpreted *Metromedia* as standing for the proposition that a City can either ban all signs or ban all signs with exception of on-premise signs to advance the City's interests in traffic safety and aesthetics. *See Outdoor Sys., Inc. v. Mesa,* 997 F.2d 604, 610–11 (9th Cir.1993). In San Diego, as in Seattle, the value of on-premise signs is to identify a company that has a presence in a building and to identify what goods or services are available at the site. Following *Metromedia,* the Ninth Circuit upheld Seattle's content-based distinction between on-premise and off-premise signs as constitutional because it furthers the government interests of traffic safety and aesthetics. *See Ackerley Communications v. Krochalis,* 108 F.3d 1095, 1099 (9th Cir. 1997).[2]

The Court finds that the City, like the city of San Diego, has a substantial interest in allowing companies to advertise the goods or services that they provide onsite. The Court further finds that the City's requirement that Miller's sign be consistent with the goods or services offered by its office on location is no more extensive than necessary to accomplish its purpose. In fact, the City stops short of achieving its goal because it does not ban all outdoor signs. *See Outdoor Sys.,* 997 F.2d at 611. The City has established that its regula-

---

**2.** The Court gives little weight to a case cited by Onsite, *North Olmsted Chamber of Commerce v. North Olmsted,* 86 F.Supp.2d 755 (N.D.Ohio 2000). It does not follow *Metromedia* and is not binding or persuasive.

tion meets the requirements of the *Central Hudson* test.[3]

## C. *Prior Restraint*

■ Onsite argues that the City's permit scheme is a prior restraint on speech because it allows for unbridled discretion and it lacks a time limit during which the City must make a decision. Onsite asserts that City's Code contains no standards to guide its sign inspector to determine whether an on-premise sign has a sufficient nexus to the purpose of the business. Next, Onsite contends that the City's Code contains no time limit within which a decision regarding a sign permit will be made. Here, Onsite requested a sign permit on June 14, 2000 and the City issued a final decision in terms of its interpretation on August 11, 2000.

The City correctly asserts that there is no Supreme Court or Ninth Circuit authority for the proposition that prior restraint principles apply to commercial speech. The seminal prior restraint cases deal with noncommercial speech. *See Near v. Minnesota,* 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931); *Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). The Supreme Court created a unique test for the government's restriction of commercial speech in *Central Hudson.* There exists one Ninth Circuit case dealing with prior restraint and signs, but it regards noncommercial speech. *See Desert Outdoor Adver. v. Moreno Valley,* 103 F.3d 814 (9th Cir.1996). There is no Ninth Circuit case requiring a time limit for sign permit applications.

The Court finds no support for Onsite's argument that it should extend the prior restraint doctrine to commercial speech. The Court also notes that Onsite received a final decision from the City within two months, and that Onsite provides no proof that the City provides untimely responses to sign permit applications. Onsite's prior restraint argument is rejected.

## D. *Equal Protection*

■ Onsite asserts that the City applies its Code in a discriminatory manner, in violation of Onsite's equal protection rights. Onsite introduced several signs at trial to support its contention that the City gave other companies favorable treatment in the permit process. Onsite also argued that the City is much harder on products than services in issuing permits. The City argues that even if it has made mistakes with regard to permit applications in the past, it has never waived its right to properly apply the Code with regard to Onsite.

The Court found that the testimony of Seattle's sole sign inspector, Chip Champlin, demonstrated that his enforcement of on-premise signs was erratic but not discriminatory. Champlin's testimony revealed that he did not always visit the office of a business to determine if there was a nexus between the sign and the business because he could not conceivably visit every company that applied for an on-premise sign. Sometimes, he visited the office after the permit was issued, sometimes he never visited, and sometimes he visited if the City received a complaint and was made aware of a potential violation. While Champlin did not demonstrate consistency in terms of visiting offices, he did not demonstrate more favorable treatment for services over goods. He visited both offices providing services (such as internet companies) and those providing goods.

The Court is not convinced that Champlin was discriminating against Onsite because the sign was for a beer product.

---

**3.** Finally, the Court finds no evidence of ulterior motive, as Miller has obtained a sign permit, has an off-premise sign in the City, and Onsite has previously obtained sign permits from the City.

The testimony of Robert Kehoe, stating that Champlin said there was too much beer on the sign, does not indicate a discriminatory motive. Rather, it indicates that Miller's office did not produce or manufacture beer, and that Miller's sign therefore could not have a beer bottle on it. Onsite's claim for an equal protection violation fails.

### E. *Onsite's Need For a Permit*

■ Seattle's Building Code 3204.4.1 provides that "[a] separate permit shall be required for a sign or signs for each business entity and/or a separate permit for each group of signs on a single supporting structure installed simultaneously." It provides an exception, where a sign permit is not necessary, when there is a "changing of the advertising copy or message on a lawfully erected painted or printed sign... designed for the use of replaceable copy."

Onsite argues that the sign on the Squire Building is intended for replaceable copy. Onsite therefore contends that it should be able to replace the copy on the sign with its own ad without obtaining a permit.

Onsite, however, concentrates on the language of the exception and ignores the language preceding the exception. § 3204.4.1 requires a separate permit for each business entity. Miller and/or Onsite are new business entities utilizing the sign, as evidence demonstrates the sign was previously owned by Squire Properties and Robert Steil. Therefore, the Court finds the City's interpretation of this Building Code exemption to be reasonable and accords appropriate deference to this interpretation. Onsite's argument that it is not required to have a sign permit is simply wrong.

### III.  CONCLUSION

The Court finds that the City's interpretation of its on-premise sign definition and of section 3204.4.1 is reasonable. The Court also finds that the City's application and interpretation of its Code satisfies the *Central Hudson* intermediate scrutiny test. The Court found no support for Onsite's argument that the City's lack of a time limit or lack of standards for evaluating signs constituted a prior restraint because there is no binding precedent applying the prior restraint doctrine in a commercial speech context. Finally, the Court found no evidence to suggest that the City's scrutiny of Onsite's sign violated its equal protection rights.

Accordingly, for the foregoing reasons, it is hereby ORDERED that judgment in favor of the City is granted. The Clerk of the Court is directed to enter judgment in favor of the City and against Onsite and to send copies of this Order to all counsel of record.